# EXHIBIT   1

## MASTER AGREEMENT FOR PROFESSIONAL CONSULTING SERVICES

This Master Agreement for Professional Consulting Services (this "**Agreement**") is made and entered into effective as of Net Results, Inc. (the "**Effective Date**") by and between Travelers Express Company, Inc., with its principal offices located at 1550 Utica Avenue South, St. Louis Park, Minnesota 55416 ("**Customer**") and The Net Results Group, Inc., 32 Wine Street, Hampton, Virginia, 23669 ("**Supplier**"). Supplier and Customer are jointly referred to as the "**Party**" or "**Parties**," as applicable.

### RECITALS

A.      Supplier is a professional consultant, designer or developer of certain professional services required by Customer.

B.      Customer and Supplier desire that Supplier provide certain services to Customer as more fully described in work orders ("**Work Orders**") executed pursuant to this Agreement, all of which will be subject to the terms and conditions of this Agreement.

### AGREEMENT

In consideration of the promises and mutual covenants set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      **Services.**

1.1     **Professional Consulting Services.** During the Term of this Agreement, as defined in Section 8.1 below, Supplier agrees to render professional consulting services to Customer, as authorized by Customer from time to time at Customer's discretion by the execution of "Work Orders" as more described in this Agreement (the "**Services**"). Supplier shall not be authorized to render any Services until a Work Order or other written authorization has been signed by an authorized representative of Customer in accordance with this Agreement for such Services.

1.2     **Work Orders.** Each Work Order shall be signed by Customer and Supplier and shall refer to, incorporate and be governed by all of the terms and provisions of this Agreement. The terms and provisions of each Work Order shall be considered a part of this Agreement. Unless otherwise expressly provided in this Agreement or in a Work Order, if any term or provision contained in a Work Order conflicts with any other terms or provisions of this Agreement, such other terms or provisions of this Agreement shall govern. Each Work Order shall include, without limitation, the following terms and provisions:

(a)     **Specification.** Each Work Order shall contain a detailed specification for the Services as mutually agreed upon between Customer and Supplier (the "**Specification**"). Customer may elect at any time and from time to time to modify the Specification by notice thereof to Supplier. If Supplier objects to any proposed Specification modification and changes in cost, Supplier shall notify Customer of its objections in detail and in writing within ten (10) business days after receiving the proposed Specification modification. Supplier and Customer will attempt to resolve any objections to a proposed Specification modification consistent with Customer's overall requirements.

(b)     **Development and Delivery Schedule.** Because time is of the essence, each Work Order shall be based on a "not to exceed" Success Fee basis and shall contain a schedule of the development and delivery of the Deliverable(s) (as defined below) for the Services (the "**Schedule**").

1

(c) **Fees, Material and Personnel.** Supplier will render the Services on a Success Fee basis, or, a "not to exceed" time and materials basis as agreed in a Work Order and in accordance with the milestones set forth therein. Each Work Order shall specify the personnel or skill level assigned by Supplier, and when Services are provided on a "not to exceed" time and Materials basis, the Work Order sale also include, the materials to be used and the respective hourly rate categories (if applicable) for each assigned personnel. Success Fee cases are exempt from this requirement.

(d) **Assistance by Customer.** Each Work Order shall describe the assistance, equipment or software, if any, which Supplier will require from Customer. Customer shall not be required to allow Supplier access to Customer's facilities after normal business hours unless otherwise specified in the applicable Work Order. Success Fee cases are exempt from this requirement.

(e) **Estimate of Service Cost.** When Services are provided on a "not to exceed" time and materials basis, each Work Order shall contain a detailed estimate of all of the time and materials to be rendered under that Work Order (the "**Estimate**"). Unless authorized in advance and in writing by Customer, Supplier's charges for all Services under a Work Order will not exceed such Estimate. If at any time Supplier reasonably believes, knows, or anticipates that the expected amounts to be invoiced to Customer under a Work Order might exceed the applicable Estimate, Supplier will immediately notify Customer of the anticipated cost and indicate the reasons for such increase. Customer at its sole discretion may elect to terminate the Work Order pursuant to Section 7.2, continue the Work Order under the agreed upon terms and conditions, or negotiate revised terms and conditions for the completion or continuation of said Work Order. If Customer elects to negotiate revised terms and conditions for the completion or continuation of said Work Order, Supplier shall negotiate in good faith and make all reasonable efforts to continue or complete the Work Order at the lowest cost possible. Success Fee cases are exempt from this requirement.

(f) **Deliverables.** Each Work Order shall specify the development materials, professional consulting services, documentation and any and all other deliverables (collectively the "**Deliverable**") to be provided, developed and/or delivered by Supplier to Customer in accordance with the Schedule for that Work Order. Success Fee cases are exempt from this requirement.

(g) **Key Persons.** The parties agree that there may be certain individuals that are essential to the accomplishment of the Services set forth in this Agreement or a particular Work Order ("**Key Persons**"). Each Work Order shall specifically identify any Key Persons. If at any time during the performance of such Work Order these Key Persons are no longer active on Customer's account or employed by Supplier for whatever reason, Supplier shall immediately notify Customer. Customer shall have the right to terminate the Work Order immediately upon written notice to Supplier. If Customer gives notice of such termination to Supplier, Supplier shall immediately cease the applicable work. Success Fee cases are exempt from this requirement.

(h) **Subcontractors.** Supplier may, at Supplier's sole expense, employ such assistants or subcontractors as Supplier deems necessary to perform the obligations required by this Agreement or individual Work Order; provided, however, Customer shall have the sole right to reject any of Supplier's assistants or subcontractors whose qualifications, in the Customer's sole judgment, are insufficient for the satisfactory performance of the obligations required by this Agreement. Supplier shall remain responsible for the performance of Services by any assistant or subcontractor, and all assistants or subcontractors employed

2

by Supplier shall be subject to all provisions of this Agreement. Success Fee cases are exempt from this requirement.

(i)    **Assignment of Rights.**  Before any employee, assistant or subcontractor of Supplier performs any Services under this Agreement, Supplier shall provide Customer with a signed copy of an employment or independent contractor/consulting agreement effecting the assignment to Customer of such employee's, assistant's or subcontractor's rights in all Deliverables, Created Works (as hereinafter defined) and other materials which may be created as a result of the performance of Services under this Agreement, including any and all copyright and patent rights. Success Fee cases are exempt from this requirement.

(j)    **Pre-screening of Personnel \*\*\*.**  Each Work Order for non Success Fee Services, shall contain a statement verifying that Supplier has conducted the following screening measures for the specified personnel:  reference checks, verification of previous employment, drug testing and criminal background checks. The screening measures are to be conducted at Supplier's expense. Further, Supplier is responsible for complying with all federal, state and municipal laws and regulations applicable to these screening measures.  Subject to such laws and regulations, Supplier agrees to comply with the following:

(i)    At a minimum, the criminal background check must include the county or counties in which the individual has resided and worked within the previous seven (7) years.  Supplier shall forward for approval the results of any criminal background check in which there is a conviction for a criminal offense other than a minor traffic offense to Customer's Human Resources Department.  The specified personnel may begin work under this Agreement only if there are no convictions other than for minor traffic offenses or if the Customer's Human Resources Department approves the assignment.

(ii)    If the above-mentioned screening measures were previously conducted by or for Supplier on an individual to be assigned to Customer within the past calendar year, Supplier need not re-screen that individual.

(iii)    At Customer's request, Supplier agrees to provide Customer with certification that the above-mentioned screening was conducted on specific individuals in compliance with this paragraph.

\*\*\* *Supplier warrants that all personnel connected with these services shall meet these requirements -- even for "Success Fee" engagements.*

1.3    **Reports.**  When Services are provided on a "not to exceed" time and materials basis Supplier shall prepare and submit to Customer, with each invoice, time and charges report showing the total number of hours worked through the previous week or agreed period for each of Supplier's personnel performing Services pursuant to the applicable Work Order and any other costs or expenses incurred by Supplier for its Services through the previous week or agreed period and report to Customer on the status of the development materials and/or Deliverables. For all Services provided, from time to time upon request from Customer, Supplier will submit written status reports describing Supplier's activities during the preceding period including: the current status of activities; resources used since the last report, with a cumulative total to date; and identification of any problems and actions taken to resolve them. Supplier will meet with Customer, at Customer's request, to review the status of Supplier's activities. Success Fee cases are exempt from this requirement.

1.4 **Right To Audit.** Customer will have the right at all times during the term of this Agreement and for 24 months after termination of the Agreement to audit the books, records and operations of Supplier insofar as may be necessary or desirable, in Customer's judgment, to determine Supplier's compliance with its obligations under this Agreement. Customer and Customer's independent auditors will have access to Supplier's books, records and operations at all reasonable times, with or without prior notice and Supplier agrees to cooperate in all respects necessary to enable Customer and its independent auditors to carry out the intent and purposes of this section. Customer may notify Supplier of any deficiencies in performance discovered in any such audit, which deficiencies shall be promptly corrected by Supplier. In the event an audit discloses any billing discrepancy in Customer's favor, Supplier shall refund the amount of any such overpayment within thirty (30) days after receipt of written notice from Customer or credit the amount of such overpayment to subsequent invoice(s).

## 2. Acceptance And Payment.

2.1 **Payment by Customer.** When Services are provided on a fixed fee basis, Supplier shall invoice Customer upon Customer's written Acceptance (as defined in Section 2.2 below) of the Deliverable, product or work performed in accordance with the milestones set forth in the Work Order. Invoices properly submitted shall be payable within forty-five (45) days after receipt by Customer. Terms shall be 2% ten (10) days, net forty-five days (45). When Services are provided on a "not to exceed" time and materials basis Customer will pay Supplier for its Services on a time and materials basis for each Work Order, unless otherwise specified in a Work Order. Customer shall have no payment obligations to Supplier other than as specified in a Work Order. Supplier will invoice Customer monthly on 2% ten (10) days, net forty-five (45) days terms, unless otherwise specified in the applicable Work Order. Customer may, without penalty or accrual of interest, withhold payment of an invoice issued under a Work Order if Acceptance has not occurred when scheduled for the Deliverable then due under that Work Order, in which case payment will be due upon Acceptance. After 45 days a late fee of 1% per month is incurred by Customer.

2.2 **Acceptance of Deliverables.** For each respective Work Order, Supplier will deliver the applicable Deliverables to Customer pursuant to the Schedule contained in that Work Order. Promptly after the delivery and any installation or implementation of the Deliverables, and consistent with Customer's overall requirements, Customer and Supplier will perform acceptance testing of the Deliverable to confirm compliance with the applicable Specifications. After completion of such testing, Customer will promptly notify Supplier in writing of Customer's acceptance ("**Acceptance**") or rejection of the Deliverables. If Customer rejects the Deliverables, Supplier will, at its sole expense, promptly make all changes or modifications necessary for the Deliverable to comply with the Specifications, but in no event more than thirty (30) days after notice of rejection from Customer. If Deliverables have not been Accepted by Customer at the end of such thirty (30) day period because of the continued noncompliance with the applicable Specifications, Supplier shall waive payment of all outstanding invoices under the applicable Work Order and Customer shall have no responsibility for payment to Supplier under the Work Order for the nonconforming Deliverables.

## 3. Ownership.

3.1 This section is purposely omitted. The Supplier owns proprietary software, a proprietary and extensive data base of service applications, carrier data, ratings, USOC coding, and related confidential information and services that will be utilized in the provisioning of services to the customer. It is impossible to determine which piece or precedent that could be established or arguably "invented" during this service engagement is somehow unique or was in any special way paid for by the Customer.

4

4.    **Confidential Information.**

4.1    **Definition of Confidential Information.** The term "**Confidential Information**" as used in this Agreement, shall include all confidential commercial or financial information of the Parties or their affiliates, now in existence or hereafter created, including without limitation, the following:

(a)    All customer related information of the Customer, including, but not limited to, customer account numbers and account balances;

(b)    All information marked as "confidential" or with similar designation or otherwise treated as confidential;

(c)    All information protected by rights embodied in copyrights, whether registered or unregistered, patents or pending patent applications, "know how," trade secrets, and any other intellectual property rights of the Parties;

(d)    All proprietary business, financial or technical information of the parties or their affiliates and any of their respective customers or vendors (including, but not limited to, customer lists, customer financial information and software licensed from third parties or owned by the Parties or their affiliates); and

(e)    Each Party's marketing philosophy and objectives, promotions, markets, customer information, materials, financial results, technological developments and other similar confidential and or proprietary information and materials.

4.2    **Exclusions to Confidential Information.** Notwithstanding the foregoing, and except to the extent protected by copyright, patent or trademark law, Confidential Information shall not include any portion of such information which the other Party can establish by clear and convincing evidence to have:

(a)    Become publicly known without breach of this Agreement; or

(b)    Been known by the other Party without any obligation of confidentiality, prior to disclosure of such Confidential Information to the other Party; or

(c)    Been received in good faith by the other Party from a third-party source having the right to disclose such information.

4.3    **Limited Use of Confidential Information.** The Parties may use the Confidential Information only for the purpose of rendering the Services to Customer. Unless otherwise agreed to in writing between Customer and Supplier, from and after the date of this Agreement, the Parties shall:

(a)    Not reproduce, copy, duplicate, divulge or use any Confidential Information, or allow any Confidential Information to be reproduced, copied, duplicated, divulged or used, except as expressly permitted above;

(b)    Require that all persons, employees, agents, partners, consultants, contractors, representatives and any other third parties (collectively, the "Representatives") who are permitted access to any Confidential Information to agree to assume all of the same obligations regarding the protection of the Confidential Information assumed by the Parties under this Agreement; and

(c)    Keep all Confidential Information in a physically secure place which will prevent anyone, except the Representatives who are permitted access to the Confidential Information to satisfy the purposes of this Agreement, from using or disclosing any Confidential Information.

5

4.4    **Proprietary Rights Notice.** Supplier will place on all copies of the Created Works a notice stating that the materials are confidential and proprietary to Customer.

4.5    **Effect of Termination.** Upon expiration or termination of this Agreement for any reason:

(a)    Unless otherwise provided, the limited right to use the Confidential Information granted to each Party under this Agreement shall immediately terminate, and neither the Parties nor their representatives shall have any further right to use any Confidential Information in any way;

(b)    Supplier shall immediately return to Customer, or destroy at Customer's request, all Created Works (including, without limitation, any developed software in source code and object code forms and all related documentation, all documents, drawings, models, apparatus, sketches, designs, source code, object code and any other tangible items containing any Confidential Information) including all complete or partial copies, recordings, abstracts, notes or reproductions of any kind made from or about such tangible items or information contained therein; and

(c)    Supplier shall provide to Customer written certification, made under oath, that Supplier has returned or destroyed all of the items identified above to Customer.

5.    **Insurance And Indemnification.**

5.1    **Insurance.** Supplier will, at its own cost and expense, obtain and maintain in full force and effect, with financially sound and reputable insurers having A.M. Best ratings of at least A (VII) or better, liability insurance to cover Supplier's obligations under this Agreement. Upon execution of this Agreement and before the commencement of any Services, Supplier will provide the Customer with a certificate or certificates of insurance evidencing the following coverages and amounts with such insurers set forth on **Exhibit B** of this Agreement.

(a)    **Insurance Policies.** No insurance policy shall be modified, altered or canceled without thirty (30) day's prior written notice to the Customer. All policies shall be primary and not contributing with any insurance coverage maintained by the Customer or its affiliates. In any insurance policy other than a policy for Professional Liability, Supplier will name the Customer, its officers, directors, employees and agents as additional insureds.

(b)    **Professional Liability.** When any professional performs Services in connection with this Agreement or any Work Order, Supplier shall maintain Professional Liability insurance of not less than $1,000,000.

(c)    **Claims-Made Policies.** All policies written on a "claims-made" basis shall ensure that (i) continuous coverage is maintained or an extended coverage period will be exercised for a period of not less than twenty-four (24) months, beginning from the time of issuance of final payment; and (ii) if not renewed or replaced, has an extended reporting period of two (2) years. No such policy shall contain any exclusion for claims arising out of purely business activities in which the insured professional is engaged as a sole proprietor, partner, officer, director or shareholder of a business enterprise. When any insurance policy is renewed or replaced, the policy retroactive date must coincide with, or precede, the commencement of Services on any Work Order.

5.2 **Fidelity Bond.** Supplier shall provide fidelity bonding of at least $500,000 for claims arising from fraudulent or dishonest acts on the part of any representative of Supplier. Success Fee cases are exempt from this requirement.

6. **Indemnification.**

6.1 **Infringement Warranty/Indemnification.** Supplier will indemnify and hold Customer harmless from any action or claim and will defend at its expense any action brought against Customer that it is based on a claim that Supplier did not have the right to enter into this Agreement or that Supplies, Documentation, Software, a system, product, or works created, when used within the scope of this Agreement, infringes a patent or copyright or the trade secret or other proprietary rights of a third party (an "**infringement**"). Supplier will pay any costs, damages, and reasonable attorneys' fees finally awarded against Customer in such an action, which are attributable to such claim. Should anything contemplated within the scope of this Agreement become, or in Supplier's opinion, is likely to become, the subject of a claim of infringement, Supplier may (a) procure for Customer the uninterrupted right to continue using the Supplies, Documentation, Software, works or product, or (b) replace or modify the Supplies, Documentation, Software, works or product to make it non-infringing; provided, however, that such replacement or modification shall, in any event, be capable of performing the equivalent functions as specified in the applicable Exhibit and compatible with Customer's existing systems and processes, or if neither (a) or (b) are possible, Supplier shall refund to Customer all fees paid by Customer under the applicable Work Order and Customer shall be relieved from making any further payments.

6.2 **Indemnification.** Supplier agrees to defend, indemnify and hold harmless Customer and its officers, directors, customers, employees, agents, and affiliates from all claims, losses, damages, judgments, liabilities, obligations, costs and expenses, including fees and expenses of attorneys, consultants and court costs, directly or indirectly incurred by Customer as a result of Supplier, or its employees' or agents' negligence, intentional act or omission, breach of this Agreement, or Supplier's alleged failure to comply with the requirements of applicable laws and regulations. In addition, Supplier shall, at its own expense, indemnify, defend and hold Customer harmless against any and all claims, losses, damages, judgments, costs and expenses, including attorneys' fees, in any action taken by or against Supplier arising from the services performed or the Supplier's performance, or failure to perform, under this Agreement.

7. **Representations and Warranties of Supplier.** Supplier represents and warrants as follows:

7.1 **Performance.** The Services to be performed by Supplier shall be performed in a timely and professional manner by the personnel designated in the applicable Work Order. Supplier warrants that at the time of delivery to Customer, the Deliverable, when specified, will meet the applicable Specifications and shall be free from errors and from defects in workmanship and materials.

7.2 **Solvency.** Supplier warrants that it is financially solvent and has the ability to perform its obligations under this Agreement.

7.3 **Compliance with Laws.** Supplier warrants and represents that it is a business entity in good standing and duly authorized to do business and perform its obligations under this Agreement. Supplier will comply with all applicable federal, state and local laws in meeting its obligations under this Agreement.

7.4 **Licenses.** Supplier will maintain and cause its employees and agents to maintain during the term of this Agreement all licenses and permits required to carry out Supplier 's obligations under this Agreement.

7

7.5 **Fiduciary Standards and Conflict of Interest.** Supplier warrants that in the performance of Supplier's duties under this Agreement, Supplier shall adhere to the highest fiduciary standards, ethical practices and standards of care and competence. Supplier warrants that there exists no actual or potential conflict of interest between Supplier, Supplier's employees, Supplier's business or financial interests or Supplier's services under this Agreement, and in the event of a potential change in Supplier's interests which may then become conflicting, Supplier shall immediately seek Customer's written approval which may be granted or rejected at Customer's sole discretion.

7.6 **Warranty Against Disablement.** Supplier warrants that no portion of any media provided to Customer contains or will contain any protection feature designed to prevent its use. This includes, without limitation, any computer virus, worm, software lock, drop dead device, Trojan-horse routine, trap door, time bomb or any other codes or instructions that may be used to access, modify, delete, damage or disable Customer's systems.

7.7 **Warranty of Title.** Supplier warrants that it owns and has the right to license or convey title to any Created Works, Deliverables, documentation and other materials covered by this Agreement. Supplier will not grant to any third party any rights or licenses to any intellectual property or technology that would conflict with Supplier's obligations or Customer's rights under this Agreement.

7.8 **Litigation.** Supplier warrants and represents that it is not a party to any pending litigation the resolution of which is reasonably likely to affect adversely the ability of Supplier to fully perform its obligations hereunder, nor is any such litigation reasonably contemplated or threatened. Supplier agrees to inform Customer in the event any such litigation occurs or becomes reasonably contemplated during the term of this Agreement.

8. **Term and Termination.**

8.1 **Term of Agreement.** This Agreement shall commence on the effective date of this Agreement and shall continue in effect for one (1) year, unless earlier terminated under this Article 8, and then shall terminate, unless renewed as provided for herein. Customer shall have the option of renewing the Agreement for successive one (1) year terms, or another mutually agreed upon renewal period term, by providing written notice to Supplier at least thirty (30) days prior to the end of the original term or the then current term of the Agreement. However, if any Work Order(s), which has been duly executed by the authorized representative of each party, specifies that all or part of Supplier's performance for the Work Order(s) shall occur after the expiration date of this Agreement, then the terms and conditions of this Agreement shall continue to govern the parties' performance until the obligations under the Agreement and Work Order(s) have been completely discharged.

8.2 **Termination By Customer or Supplier Without Cause.** Customer or Supplier may elect, at its sole discretion, to terminate this Agreement or any Work Order (in whole, or in part) upon fifteen (15) days written notice thereof to Supplier. Upon receipt of such notice, Supplier shall immediately cease all Services under this Agreement or the applicable Work Order, as the case may be, and shall submit to Customer, within three (3) days after receipt of such notice, a final invoice for Services rendered through date of termination. Customer will pay such undisputed invoice amounts within forty-five (45) days of receipt of invoice. Terms shall be 2% ten (10) days, net forty-five (45) days.

8.3 **Termination By Customer for Cause.** If Supplier breaches any provision of this Agreement, Customer may elect to terminate this Agreement or the applicable Work Order effective immediately. If this Agreement is terminated by Customer under this Section 8.3 and Customer is not in breach of this Agreement, Supplier shall waive payment of all reasonably disputed outstanding invoices rendered after or at the time of termination under any specified Work Orders and Customer shall have no further

8

responsibility for payment to Supplier, subject to ruling by a Court of competent jurisdiction. Other conditions noted in the Scope of Work and Terms and Conditions are not waived nor altered by this clause.

8.4 **Termination By Supplier for Cause.** If Customer breaches any provision of this Agreement, and such breach is not cured within thirty (30) days written after notice thereof to Customer, Supplier may elect to terminate this Agreement or the applicable Work Order effective immediately. If this Agreement is terminated by Supplier under this Section 8.4 and Supplier is not in breach of this Agreement, Customer will pay such undisputed invoice amounts within forty-five (45) days of receipt of invoice for all Services rendered through the date of such termination unless payment is waived under Section 2.2 above. Terms shall be 2% ten (10) days, net forty-five (45) days. Other conditions noted in the Scope of Work and Terms and Conditions are not waived nor altered by this clause.

9. **Notices.** Any notice permitted or required by this Agreement must be in writing and shall be deemed given when sent by registered or certified mail, return receipt requested, or overnight delivery, and addressed as follows:

If to Customer:        Director of Procurement
                       Travelers Express Company, Inc.
                       1550 Utica Avenue South, Suite 100
                       St. Louis Park, MN  55416
                       952-591-3416


If to Supplier:        Net Results, Inc.
                       32 Wine Street
                       Hampton, VA 23669

10. **Miscellaneous.**

10.1 **Relationship of the Parties.** No joint venture, partnership, agency, employment relationship or other joint enterprise is contemplated or created by this Agreement. No Representative of Supplier shall be considered an employee of Customer. Supplier shall take all actions and do all things which are required to ensure that it has complied with all laws respecting its position as an independent contractor providing Services pursuant to this Agreement. In making and performing this Agreement, the parties shall act at all times as independent contractors, and at no time shall either party make any commitments or incur any charges or expenses for or in the name of the other party.

10.2 **Personnel.** Whenever Supplier's personnel are present on the Customer's premises, Supplier shall cause all such personnel to comply with all Customer policies and procedures governing on-site work, including the Customer's safety, security and data protection policies and procedures, and all reasonable instructions and directions issued by the Customer. At the Customer's reasonable request, Supplier will promptly replace its personnel providing Services under this Agreement. The Customer will not be required to pay for Services performed in an unsatisfactory manner by such replaced Supplier personnel or for the time spent to orient replacement Supplier personnel.

10.3 **Non-Solicitation - Non-Hire.** Neither Party shall not offer, promise or engage in any employment or contractual service agreement, directly or indirectly with any employee of the other Party during the term of this Agreement or within one (1) year of the termination or expiration of a Work Order.

10.4 **Employment Taxes and Benefits.** To the extent required under applicable law, Supplier shall report as income all compensation received by Supplier pursuant to this

Agreement and pay all taxes due on such compensation. Supplier shall indemnify and hold harmless Customer and its employees, officers, directors, representatives and agents, and their respective heirs, personal representatives, successors and assigns, from any and all claims, actions, causes of action, demands, liability, losses, costs and expenses (including court costs and reasonable fees of attorneys and other professionals) arising from any obligation imposed on Customer to pay any withholding taxes, social security, unemployment insurance, worker's compensation insurance, disability insurance or similar items, including interest and penalties thereon, in connection with any payments made to Supplier by Customer pursuant to this Agreement.

10.5   **Governing Law and Venue.** This Agreement will be construed and enforced in accordance with and governed by the laws of the State of Minnesota; provided, that laws regarding conflicts of laws will not defeat application of the substantive laws of the state of Minnesota. The parties agree to the jurisdiction of the State of Minnesota. The jurisdictional venue for any proceedings involving this Agreement shall be Hennepin County, Minnesota, unless removed to Federal Court in Washington, D.C..

10.6   **Integration.** This Agreement and the Work Order(s) (which are incorporated herein by reference and made a part hereof) set forth the entire agreement and understanding of the parties in respect of the transactions contemplated hereby and supersede all prior agreements, arrangements and understandings, whether written or oral, relating to the subject matter hereof.

10.7   **Assignment.** Neither party may assign this Agreement without the prior written consent of the other party. This Agreement shall be binding upon, and inure to benefit of, the successors and permitted assigns of the parties hereto.

10.8   **Non-Exclusive.** Nothing in this Agreement is intended to restrict Customer from entering into similar agreements with third parties as long as all payment terms and obligations to the Supplier as noted herein, remain unchanged and are honored by the Customer.

10.9   **Waiver.** Failure of either party to object to any act or omission of the other party, no matter how long the same may continue, shall not be deemed to be a waiver by such party of any of its rights hereunder. No waiver by any party at any time of any other provision of this Agreement shall be deemed a waiver or breach of any other provision of this Agreement or consent to any subsequent breach of the same of any other provision hereunder. If any act or omission by any party shall require the consent or approval of another party, such consent or approval of such act or omission on any one occasion shall not be deemed a consent to or approval of said act or omission on any subsequent occasion or consent to or approval of any other act or omission on the same or any subsequent occasion. Waiver of any rights or remedies must be in a signed writing by the waiving party.

10.10   **Modifications.** This Agreement may not be modified, changed or supplemented, nor may any obligations hereunder be waived or extensions of time for performance granted, except, by written instrument signed by both parties.

10.11   **Counterparts.** This Agreement may be executed simultaneously in multiple counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

10.12   **Headings.** The paragraph headings contained in this Agreement are for convenient reference only, and shall not in any way affect the meaning or interpretation of this Agreement.

**10**

10.13   **Severability.** If any provision of this Agreement is held to be illegal, invalid or unenforceable under present or future laws effective during the term hereof, such provision shall be fully severable; this Agreement shall be construed and enforced as if such illegal, invalid or unenforceable provision had never comprised a part hereof; and the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid or unenforceable provision or by its severance from this Agreement. Furthermore, in lieu of each such illegal, invalid or unenforceable provision, there shall be added automatically as a part of this Agreement a provision as similar in terms to such illegal, invalid or unenforceable provision as may be possible and be legal, valid and enforceable.

10.14   **Force Majeure.** Neither party to this Agreement shall be liable for failure to perform or delay in performance of any of its obligations under this Agreement (except payment of amounts already due and owing) where such failure or delay results from any act of God, military operation, catastrophic event directly related to terrorist activity, national emergency, civil commotion, or utility, or the order, requisition, request or recommendation of any government agency or acting government authority, or any party's compliance therewith, or government probation, regulation, or priority, or any change in laws or regulations which prevent any party from providing services required by this Agreement, or any other cause beyond any party's reasonable control whether similar or dissimilar to the foregoing causes.

10.15   **Attorneys' Fees.** If any dispute arises between the parties regarding any party's rights or obligation pursuant to this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, attorneys' costs, expert witness fees, and arbitration or court costs incurred in connection with such litigation including all cost of appeals and travel time and expenses.

10.16   **Survival.** Any provisions of this Agreement which requires performance or grants a benefit after termination of the Agreement shall be deemed to survive the termination of the Agreement.

10.17   **Interpretation.** This Agreement shall be fairly interpreted in accordance with its terms and without any strict construction in favor of or against either party. Any ambiguity shall not be interpreted against the drafting party.

10.18   **Use of Name.** Supplier agrees not to refer to Customer directly or indirectly in any promotion or advertisement, metatag, news release or release to any general or trade publication or any other media without the prior written consent of Customer, which consent may be withheld at Customer's sole and complete discretion.

10.19   **Non-Discrimination.** The parties incorporate by reference the provisions of the equal opportunity clauses of Executive Order 11246, 41 CFR 60-1.4(a); the Vietnam Era Veterans Rehabilitation and Adjustment Act, 41 CFR 60-250.5(a); and Section 503 of the Rehabilitation Act, 41 CFR 60-741.5(a).

11

**IN WITNESS WHEREOF,** the Parties hereto have executed this Agreement.

| Travelers Express Company, Inc. | Net Results |
|---|---|
| _____ | _____ |
| Signature | Signature |
| _____ | _____ |
| By: Name  *Willia J Putney* | By: Name  *Justin Fuller* |
| _____ | _____ |
| Its: Title  *V. P. CIO* | Its: Title  *VP, Business Dev.* |
| _____ | _____ |
| Date | Date  *7.14.05* |

*Master Agreement for Professional Consulting Services*
*12/13/04*

**Exhibit A**

**Insurance Coverage**

| COVERAGE | MINIMUM LIMITS OF LIABILITY |
|---|---|
| Workers' Compensation & Employers Liability Insurance (as required by the state): | |
| Workers' Compensation:<br>Employers Liability:<br>a.   Bodily injury by accident:<br>b.   Bodily injury by disease | Statutory Limits<br>$100,000 each accident<br>$100,000 each employee<br>$500,000 policy limit |
| Commercial  General Liability  Insurance  (Primary & Umbrella) or Equivalent: | |
| Commercial General Liability<br>Insurance including:<br>a.   Bodily Injury<br>b.   Broad Form Property Damage<br>c.   Contractual Liability<br>d.   Completed Operations (2 years<br>       after substantial completion of<br>       entirety of project) | $1,000,000 per occurrence<br>$2,000,000 aggregate |
| Comprehensive Automobile Liability Insurance: | |
| To include non-owned, hired or rented<br>vehicles as well as owned vehicles:<br>a.   Bodily Injury<br>b.   Property Damage | $1,000,000/CSL per person<br>$1,000,000 for each accident/$2,000,000<br>aggregate |
| Umbrella/Excess Liability Insurance: | |
| Excess/Umbrella Coverage providing<br>additional limits Comprehensive<br>Automobile liability, Employer's<br>Liability, and Commercial General<br>Liability Insurance Coverages | $2,000,000 as minimum limits of liability |
| Other: | |
| All Risk Property Coverage Insurance<br>on Equipment, Tools, and Materials<br>owned or rented by Supplier | Amount to be determined by Supplier as necessary<br>to protect against loss. |

13

### *SAMPLE WORK ORDER*

**Hiring Manager:** _____
**Phone:** _____
**Cost Center:** _____
**Project name/#:** _____
**IP#:** _____

### WORK ORDER _____

This Work Order _____ is made and entered into effective the _____, _____ 20__, by and between _____ ("Customer") and _____ ("Supplier"). This Work Order _____ is hereby made part of and governed by the terms and conditions set forth in the Master Agreement for Consulting Services by and between _____ and _____ Corporation dated _____, _____.

**Specification:**

**Development and Delivery Schedule:**

**Fees, Materials and Personnel:**

**Assistance by Customer:**

**Estimate of Service Cost:**

**Deliverables:**

**Key Persons:**

**Subcontractors:**

**Pre-Screening Statement:**   Supplier has conducted the pre-screening of personnel as required in Section 1.2(k) of the Master Agreement for Consulting Services.

IN WITNESS WHEREOF, the Parties hereto have executed this Work Order One the date first above written.

<Insert Information>                     <Insert Supplier>

_____          _____
Signature                                Signature

_____          _____
By: Name                                 By: Name

_____          _____
Its: Title                               Its: Title

_____          _____
Date                                     Date

14

## TELECOM AUDIT SERVICES WORK ORDER 1

Hiring Manager: Bob Walsh
Phone: 952.591.3416
Cost Center: 11221
Project name/#: AT&T

This Work Order #1 is made and entered into effective the July 18th, 2005, by and between Travelers Express Company, Inc. ("Customer") and Net Results Group, Inc. ("Supplier"). This Work Order #1 is hereby made part of and governed by the terms and conditions set forth in the Master Agreement for Professional Consulting Services by and between Travelers Express Company, Inc., and Net Results Group, dated, July 18th, 2005.

**A.    Term:**
     1. 1 year from execution of contract.

**B. Services:**

1. Carrier to be audited:

     a.  AT&T

2. Based upon carriers contract may be audited retroactively for 2 years.

3. Review and verify AT&T monthly telecom invoices, from most current invoice, retroactive to the applicable statute of limitations or governmental regulation for billing rate, services, taxes and surcharge accuracy. Prepare and submit claims (if applicable) to telecom provider to recoup billing errors and eliminate from future invoices. The review will include interexchange (IXC) services as well as any local access components.

     The review will include is not limited to the following:

     a.  Verify tariff rates, volume discounts and contract compliance (have the right rates and discounts been applied?)

     b.  Order Customer Service Records or itemization of monthly recurring charges (are the monthly recurring charges correct?)

     c.  A comparison of the billed services with the actual service inventory and inventory changes (e.g. have disconnected services been removed from the bills?)

     d.  Verify that the services physically exist by conducting investigations of the demarcs and/or test dial lines (do the circuits on the bill actually exist?)

     e.  Verify mileage component on private lines (has the mileage been calculated appropriately?)

     f.  Verify address information on private lines (are these valid Customer sites?)

    g.   Rate changes due to negotiations (have the rates been reduced as agreed/when agreed?)

    h.   Negotiated credits (have the appropriate credits been applied?)

    i.   Taxes and surcharges (have the appropriate taxes and surcharges been applied?)

    j.   A review of the bills to determine leakage (are long distance services being provided outside of the contracts and/or been carried out by others than the preferred carrier?)Future invoices may be audited, reviewed and verified upon Customer's prior written approval.

    k.   Audit will excludes all service and maintenance contracts fees or charges.

4.   Identify used and unused circuits and telephone lines within Customer's existing network configuration.

        i.      Identify, create, and provide to Customer a demarcation survey (profile of inventory of lines and circuits) with in 30 days    .

## C.    Personnel:

**Net Results key personnel working on project:**

**David M. Russie**, Vice President & General Manager.  Dave has been the General Manager for 4-1/2 years.  Prior to NRG-PSD, Dave was with AT&T'S college and university solutions division where his key responsibilities included Project Management, Market Research, Marketing Planning, Sales Support, Web Page Content and Measurements.  Dave was instrumental in winning the Malcolm Baldridge Award in 1994.  He has earned two MBA degrees.

**Marshall Weingarden** is the head of consulting services.  Marshall has been a telecommunications consultant for thirty-six years.  He is known for his visionary viewpoint and pioneering initiatives.  For example, Marshall began developing telecommunications software in 1976 and was responsible for developing call accounting software with management reports that were used as a standard performance metric and to change consumer behavior.

**Mike Nowak, Project Manager**.  Mike joined NRG in 2001 after 32-years with AT&T.  Mike has an extensive background in Client account management and support, including plant and installation experience; and manages implementation for large and complex projects, often involving hundreds of sites.

**Mike Stoliker, Senior Analyst**.  Mike has been with NRG for six years.  He is responsible for supervising analysts and developing client reports.  He manages our telecommunications billing operations that receives, validates and approves invoices for payment for our clients.

**Edward Smith, IV, Senior Analyst**.  Eddie managed a group at Global Crossing that recovered over billings from other carriers.  He has a BA in Accounting and is experienced with using databases as analytical tools.  He is responsible for developing, creating, and managing databases for specific clients and projects.

**Timothy Smith, Senior Analyst**.  Tim joined NRG from Global Crossing where he worked with Eddie in the group that recovered carrier over billings.

**Brenda Gauvin**, Analyst – Brenda has been with NRG for seven years as an analyst.  Brenda is degreed as a Master of Library Science.

**Deborah Germain, Customer Support** - - Debbie joined CAI after five years as the telecommunications supervisor for a third-party service provider where she managed their telephone system and services, including telephone system programming. Debbie assists clients with trouble tickets, orders of all types, and project implementation.

Customer's designated contacts:

Bob Walsh, Director of Procurement
1550 Utica Avenue South
Mail Stop 5022
St. Louis, Park, MN  55416
952.591.3416 (phone)
952.591.3113 (fax)
rwalsh@moneygram.com

Unless provided by the designated MGI contact individual(s), under no circumstances may anyone from your organization or any affiliated organization contact any MGI employee of any rank regarding this Work Order other than those specified herein.  No individual(s) representing your organization or any affiliated organization should meet with or attempt to meet with any \ MGI employee of any rank regarding this Work Order other than those specified herein. Violation of any of these parameters may cause MGI to immediately terminate the services and payment of any fees under this Work Order.

## Assistance by Customer

MIG involvement should be as follows:

- Furnish letters of agency in the format provided by NRG to vendors to be audited
- Furnish A/P run identifying AT&T telecommunications accounts
- Furnish electronic (CD-ROM, Web-based, FTP) invoices for 3-recent months
- Furnish access to paper invoices (copies by NRG)
- Furnish contract copies or vendor contacts for NRG to obtain copies

    Anticipated time for the above 5 items is 2- weeks.

- Provide invoice information to NRG monthly

    Anticipated time is 2-3 hours per month based upon establishment of an efficient process.

**D.    ESTIMATED TIMELINE/DELIVERY DATE**

Data Collection:        1-2 months from Agreement Effective Date

Invoice Analysis and Inventory of lines and circuits network configuration: 2 months from Data Collection completion

Overall Audit completion:  4 months from Agreement Effective Date

Saving Realization:  Begins 4-6 months after audit completion

If the Deliverables are not completed by the Delivery Date/Timeline, or deadlines or milestones are missed, Customer shall continue this Work Order in effect and require Supplier to continue providing the Services, unless Customer gives Supplier written notice of termination of this Work Order.

This Work Order will be considered complete when Supplier has completed its responsibilities to the reasonable satisfaction of Customer.   Customer will notify Supplier in writing when Work Order is complete.

**E.     Compensation:**

**Historical Audit Fees:**
Supplier's fee shall be based solely upon the net savings Customer's cost savings realized by Customer thru recoveries from vendors.   Customer will only accept recoveries from vendor ("Historic Savings"). When Supplier finds, corrects and provides realizes Historic Savings, Customer is invoiced based upon the actual recovery.

Supplier fee is a 35% of actual recoveries in the form of cash, refunds or billing credits that the client actually gains benefit from.

**Prospective Savings Fees:**
Only the Customer's Director of Procurement may request in writing the prospective saving report from Supplier.  Supplier will present Customer Prospective Savings recommendations to MGI's Director of Procurement and other individual's designated by MGI's Director of Procurement. Each recommendation must be submitted to Customer's Director of Procurement who has the sole authority to approve Supplier's Prospective Savings Recommendations.

Supplier's fee for reducing existing recurring monthly charges and telephone call costs (Prospective Savings) is 35% of your net savings for nine (9) months after the accurate implementation of each recommendation. Net Savings is calculated as shown in Exhibit B, attached.  The prospective savings fee for each accepted and implemented recommendation will continue for the shorter period of nine (9) billing months or the duration of the implemented recommendation.  For example, if a recommendation is accepted and implement, but after three months it is eliminated, then the Prospective Savings Fee would be calculated for only the three months that the accepted and implemented recommendation produced savings.  All items that Customer is working on or identified will be excluded from the prospective savings. The items that Customer is currently working on are shown in the attachment entitled "Current Customer Initiatives."

Customer agrees to accept or reject, within sixty days of receipt, each recommendation of Supplier. In the event Customer rejects any recommendation of Supplier, Customer agrees to not implement that recommendation, including modifications of that recommendation that in any office or facility operated by Customer for a period of nine (9) months following the date of rejection. In the event Customer initially rejects any recommendation, Customer may subsequently accept that recommendation within the three month period following rejection and have it implemented by Supplier.

The "Cost per minute prior to the recommendations of Supplier" is the average cost per minute for each class of call for the complete billing period prior to acceptance of this proposal. All other base costs are for the same period. When the calculation of any of the financial benefits to Customer does not fit into the process described in Exhibit B, Customer and Supplier shall agree upon a formula, as regards those particular benefits, that fairly reflects the intent of this proposal.

Supplier's fee for cost reduction is payable as follows. Following complete and correct implementation of each accepted recommendation, Supplier will generate a monthly invoice based upon the results of each monthly review until the full three months for each recommendation has been completed. Since recommendations may be implemented at different times, the total period during which billing will be rendered by Supplier may exceed nine (9) months.

Supplier shall invoice Customer   upon receipt of the full recovery by Customer. Customer shall pay the undisputed invoice in 2/10 net 30 days from Customer's receipt of invoice.

**F.    Deliverable Materials:**

1.    Supplier will provide Customer bi-weekly written status reports, and will provide timely updates if and when a significant finding takes place.  Timely shall mean within three business days or less.

2.    Supplier will provide Customer with 4 user access to Supplier's Clarity™ system, enabling Customer to review project information, results reporting, and to track progress and address any issues.  Access will be granted until the all carrier credits are received

3.    Prepare and provide to Customer a report summarizing the overall audit and detail inventory findings in a format meeting reasonable Customer requirements.

4.    Create and provide to Customer a demarcation survey (full inventory of used and unused lines and circuits) for all electronic auditable items.   NRG does not guarantee a complete electronic inventory of non-electronic invoice information.

5.    Upon audit completion, Supplier will provide Customer a written and oral presentation, at a date and time requested by Customer and approved by Supplier, to an audience comprised of Customer's business representatives, summarizing the audit engagement process and significant findings.  At Customer's discretion, this meeting may occur via phone or in person.

**G. TRAVEL**

1.    Supplier agrees to pay for reasonable pre-approved travel expenses including airfare, hotel accommodations, rental car, and meal expenses in support of the audit project, up to a maximum of $3,500.  The parties will use commercially

reasonable efforts to develop a mutually agreeable solution in the event travel costs in support of the audit project are projected to exceed $3,500. Supplier shall abide by MoneyGram's Travel Policy.

IN WITNESS WHEREOF, the Parties hereto have executed this Work Order One the date first above written.

Travelers Express Company, Inc.

Signature

By: Name    *Anthony P. Ryan*

Its: Title    *VP/GM*

Date    *7/10/05*

Net Results Group, Inc.

Signature

By: Name    *Justin Fuller*

Its: Title    *VP Business Dev.*

Date    *7/14/05*

## Exhibit B - Calculation of Net Monthly Savings

*A) Where costs are usage sensitive (i.e., costs vary with the amount of time spent on telephone calls), Average Net Monthly Savings are calculated as:*

Step 1: Calculate the Cost Per Minute prior to the recommendations of NRG

Step 2: Calculate Gross Savings Per Month

Cost per minute prior to the recommendations of NRG
- Cost per minute after the correctly implemented recommendations of NRG
Savings per minute
X Total Minutes of Usage Per Month
Gross Savings Per Month

Tax and surcharge savings are to be added as they may apply.

Step 3: Calculate the Cost of Implementation
If a capital expenditure is involved, divide the installed cost by 24 to obtain the monthly cost to amortize the expenditure over three years.
If new services are installed, total the cost of installation and divide by 12 to amortize the cost over the first year of implementation and to provide the monthly cost.
For all other one-time costs, divide the cost by 12 to amortize the cost over the first year of implementation and to provide the monthly cost.
Calculate the Cost of Implementation Per Month by adding together the monthly portion of the three items above as they may apply.

Step 4: Calculate the Net Monthly Savings

Gross Savings Per Month
- Cost of Implementation Per Month
Net Monthly Savings

*B) Where costs are not usage sensitive, but a flat monthly charge, net savings is calculated as follows:*

Step 1: Calculate Gross Savings Per Month

Flat monthly cost prior to the recommendations of NRG
- Flat monthly cost after the correctly implemented recommendations of NRG
Gross Savings Per Month

Taxes and surcharge savings are to be added as they may apply.
Step 2: Calculate Cost of Implementation

If a capital expenditure is involved, divide the installed cost by 24 to obtain the monthly cost to amortize the expenditure over three years.
If new services are installed, total the cost of installation and divide by 12 to amortize the cost over the first year of implementation and to provide the monthly cost.
For all other one-time costs, divide the cost by 12 to amortize the cost over the first year of implementation and to provide the monthly cost.
Calculate the Cost of Implementation Per Month by adding together the monthly portion of the three items above as they may apply.

Step 3: Calculate the Net Savings Per Month

Gross Savings Per Month
- Cost of Implementation Per Month
Net Monthly Savings

CURRENT CUSTOMER INITIATIVES

Current Customer Initiatives are work that has already been begun by Customer and which is therefore excluded from Supplier's work.

| Supplier | Description of Initiative | | | |
|---|---|---|---|---|
| **Sample**: All Suppliers | VoIP | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |